**Rebecca DISORBO, Plaintiff–Appellee–Cross–Appellant,**

**Jessica DiSorbo, Plaintiff–Cross–Appellant,**

**v.**

**Matthew HOY and Kenneth Hill, Individually and as Agents, Servants and/or Employees and Police Officers of the City of Schenectady Police Department, Defendants–Cross–Appellees,**

---

The City of Schenectady and Ronald Pedersen, Individually and as an Agent, Servant and/or Employee and Police Officer of the City of Schenectady and the City of Schenectady Police Department, Defendants–Appellants–Cross–Appellees.

Docket Nos. 02–7586, 02–7922, 02–7956, 02–7988.

United States Court of Appeals, Second Circuit.

Argued: June 19, 2003.

Decided: Aug. 29, 2003.

Nancy E. May–Skinner (James A. Resi-
la, on the brief), Carter, Conboy, Case,
Blackmore, Maloney & Laird, P.C., Alba-

ny, NY, for Defendant–Appellant–Cross–Appellee The City of Schenectady.

Steve Coffey (Michael Koenig, on the brief), O'Connell and Aronowitz, Albany, NY, for Defendant–Appellant–Cross–Appellee Ronald Pedersen.

Kevin A. Luibrand (Adrienne J. Kerwin, on the brief), Tobin and Dempf, LLP, Albany, NY, for Plaintiff–Appellee–Cross–Appellant Rebecca DiSorbo and Plaintiff–Cross–Appellant Jessica DiSorbo.

James B. Tuttle, The Tuttle Law Firm, Albany, NY, for Defendants–Cross–Appellees Matthew Hoy and Kenneth Hill.

Before: WALKER, Chief Judge,
LEVAL, KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge.

This case involves disturbing allegations of police brutality. In the early morning hours of December 27, 1998, while at the Union Inn Bar in Schenectady, New York, plaintiff-appellee-cross-appellant Rebecca DiSorbo was arrested by defendant-appellant-cross-appellee Ronald Pedersen, a Schenectady police officer. Rebecca DiSorbo claims she was arrested only because she rejected his personal advances. Rebecca DiSorbo's sister, plaintiff-cross-appellant Jessica DiSorbo,[1] was arrested shortly thereafter, and both sisters were transported to the police station where they allegedly were victims of heinous acts of police aggression committed by Pedersen and two of his colleagues, defendants-cross-appellees officers Matthew Hoy and Kenneth Hill. Rebecca DiSorbo alleges that she was choked, slammed against the wall, thrown to the ground, and struck while defenseless on the floor. Jessica DiSorbo contends that she was slammed into a door and was forcibly dragged through the station.

After three jury trials, judgment was entered by the United States District Court for the Northern District of New York (Kahn, *J.,*). Rebecca DiSorbo prevailed in her excessive force, battery, and abuse of process claims against Pedersen, and the jury awarded compensatory and punitive damages totaling $1.675 million, for which the court ordered defendant-appellant-cross-appellee City of Schenectady to indemnify Pedersen. The jury also found municipal liability for the City under *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), upon concluding that Rebecca DiSorbo's constitutional rights were violated as a result of a City practice or custom.

In an order also filed this date, we uphold Pedersen's liability for excessive force, battery, and abuse of process, as well as the City's liability under *Monell.* Because we conclude that Pedersen and the City should be liable for the brutal attack suffered by Rebecca DiSorbo, we now address the District Court's rulings regarding damages.

This opinion considers whether the District Court improperly required the City to indemnify Pedersen and whether the punitive and compensatory damages awards were excessive. We conclude that a state court decision affirming the City's refusal to indemnify Pedersen for compensatory and punitive damages collaterally estops Pedersen from seeking indemnification here and therefore vacate the District Court's indemnification order. We note, however, that because the City is liable under *Monell,* the City is jointly and severally liable for the compensatory damages

---

1. Plaintiff-appellant Jessica DiSorbo since has married, and now goes by the name Jessica Baker. For clarity purposes, we refer to her by her name at the time of the incident, Jessica DiSorbo.

award, regardless of whether the City had an independent duty to indemnify Pedersen. With respect to the size of the damages awards, while we fully appreciate the gravity of the harm suffered by Rebecca DiSorbo and the justification for substantial compensatory and punitive damages in the face of such repulsive police misconduct, we are bound by precedent to compare the awards in this case with the awards in analogous cases. In so doing, we find that they were excessive. A new trial on damages therefore is necessary unless Rebecca DiSorbo chooses to accept a reduced damages award, a process referred to as remittitur. Accordingly, we remand for a new trial on damages, unless the plaintiff agrees to remit, resulting in $250,000 in compensatory damages and $75,000 in punitive damages.

## BACKGROUND

### I. Trial Testimony on the Events of December 27, 1998

The parties offer very different accounts of the events at the Union Inn Bar and subsequently at the police station.[2] The following summarizes the evidence adduced by the parties at the two trials concerning the individual officers' liabilities.

### A. Plaintiffs' Version

The DiSorbo sisters present themselves as innocent victims of out-of-control police officers who resorted to deplorable acts of brutality to punish them for rebuking personal advances. Shortly after midnight during the early morning hours of December 27, 1998, Rebecca DiSorbo, Jessica DiSorbo, and another woman went to the Union Inn Bar, where they participated in typical bar behavior, including drinking, playing pool, and socializing with friends. Sometime between 1:00 a.m. and 2:00 a.m., according to Rebecca DiSorbo, Pedersen approached her and made personal advances by asking, "So where's your boyfriend?",[3] to which she answered that her boyfriend was in Tennessee. When Pedersen inquired further about her boyfriend, Rebecca DiSorbo said he was a police officer, hoping this would discourage Pedersen. Pedersen then purportedly boasted that he too had a badge, but Rebecca DiSorbo told him that she was unimpressed and walked away. Rebecca DiSorbo resumed playing pool, had a drink with a friend, and danced for a little while. Pedersen soon approached her again, this time demanding to see her identification. Rebecca DiSorbo maintains that even though she willingly complied with Pedersen's request for identification, he aggressively grabbed her right arm, twisted it behind her back, and forced her out the door.

Once outside the bar, Rebecca DiSorbo was handcuffed and placed in a police vehicle Pedersen had summoned. Jessica DiSorbo left the bar after a friend informed her of what was happening to her sister. Jessica DiSorbo claims she accidentally dropped a beer glass as she asked the officers what they were doing to her sister. The officers then handcuffed Jessica DiSorbo as well and placed her in the vehicle

---

2. Although a surveillance video camera captured many of the events at the station, it is difficult to determine from the videotape what actually happened. Most notably, Rebecca DiSorbo alleges that the choking incident, discussed in greater detail shortly, occurred during a brief period when she and Pedersen were not within the camera's view.

3. On a cold record, Pedersen's question about the presence of Rebecca DiSorbo's boyfriend may seem somewhat odd. Taken in context, however, Rebecca DiSorbo explains that she interpreted Pedersen as asking whether she had a boyfriend.

next to her sister. With Hill driving and Hoy in the passenger seat, the women were brought to the police station. Contrary to the officers' contentions, Rebecca DiSorbo denies ever hitting her head against the vehicle's partition or window during the trip to the station. Pedersen traveled to the station in a separate vehicle.

Upon arriving at the station, the officers escorted the DiSorbo sisters, still handcuffed, through the garage area known as the "sallyport." Hoy first led Jessica DiSorbo toward the doorway entrance to the station. Jessica DiSorbo contends that, as Hoy walked her through the sallyport, he aggressively slammed her into the entry door. Hoy then brought Jessica DiSorbo into the booking room. As memorialized in a surveillance videotape, Hoy bent Jessica DiSorbo forward to move her along. Jessica DiSorbo claims that she was not offering resistance at this point, and alleges that, when she tried to stand up straight, Hoy threatened, "If you keep doin' that, I'm going to slam your head against the wall." He then pushed her to the floor, causing her left side to slam onto the ground.

Rebecca DiSorbo's allegations about what transpired at the station are even more serious. She claims that as she walked down the hall with Hill and Pedersen, she made a comment to Pedersen along the lines of, "I hope you're happy, this is basically all because of you." In response to this comment, she claims that Pedersen seized her from behind and pushed her against the wall to a blind spot out of view of the surveillance camera. Pedersen then allegedly grabbed her throat, slammed her body against the wall, and choked her with such force that she was unable to breathe and began to lose vision. When Pedersen stopped choking her, Rebecca DiSorbo kicked him out of

anger. Rebecca DiSorbo claims that Pedersen then threw her onto the ground and struck her repeatedly as she lay face down and defenseless. After joining her sister in the holding cell, Rebecca DiSorbo was allowed to make a phone call to her mother. In that conversation, which was audiotaped, Rebecca DiSorbo cried and stated that "he beat the shit out of me" because she "would not go out on a date with this guy," referring to Pedersen.

## B. Defendants Officers' Version

In stark contrast, Pedersen depicts himself as a conscientious police officer, dutifully doing his job even when off-duty. At about the time the DiSorbo sisters arrived at the Union Inn Bar, Pedersen was resting at home during his evening off. After awaking at approximately 2:30 a.m. and unable to fall back to sleep, Pedersen decided to go to the Union Inn Bar where his brother, Roy Pedersen, worked as a doorman. While socializing with a friend at the bar, Pedersen noticed Rebecca DiSorbo, who he says he suspected to be underage, stumble on a step in a manner that suggested intoxication. Following what he stated was his obligation to act whenever he witnesses a possible violation of the law, even if technically off-duty, Pedersen approached Rebecca DiSorbo and requested identification. Rebecca DiSorbo's response, according to Pedersen, was one of irrational fury. Rebecca DiSorbo not only refused to comply with his request for proof of age, but also launched a profanity-ridden tirade toward him. Pedersen maintains that he identified himself as a police officer and made a second request for identification, but Rebecca DiSorbo continued to curse at him and refused to produce identification.

At this point, Pedersen went to his brother, Roy Pedersen, for assistance in handling the situation. Pedersen explains

that Rebecca DiSorbo complied with his brother's request for identification, but in the process continued to shout vulgarities toward him and even reached around Roy Pedersen to strike him. Pedersen contends that he once again informed Rebecca DiSorbo that he was a police officer, and told her that if she continued to behave in this manner, she would be arrested. After Rebecca DiSorbo refused to calm down and tried to strike him again, Pedersen arrested her for harassment in the second degree.[4] Pedersen recalls that when he informed Rebecca DiSorbo that she was under arrest, she attempted to punch him, forcing him to take her arm, twist it behind her back, and escort her out of the bar. Outside the bar, a police vehicle with Hoy and Hill awaited. According to Hoy, Jessica DiSorbo, who had exited the bar at this point, screamed obscenities and threw a beer mug at him and Hill, which missed the officers and exploded on the curb. Because of this act, Hill arrested Jessica DiSorbo, requiring Hoy's assistance in handcuffing her because she was resisting. The DiSorbo sisters were placed in the police car and driven to the station by Hoy and Hill. Throughout the trip, Hoy recalls that Rebecca DiSorbo screamed obscenities and repeatedly banged her head on the driver's side window, causing a loud sound when her head impacted the glass.

Upon arriving at the station, Hoy first led Jessica DiSorbo through the garage into the doorway of the station. Hoy claims that Jessica DiSorbo was extremely uncooperative as they walked toward the entry door, continuously kicking him as they walked in the sallyport area and forcefully doing exactly the opposite of what he told her. Because of her refusal to follow his instructions, Hoy stated that

he had no choice but to resort to physical force to direct her through the sallyport area. While Hoy admits that he pulled Jessica DiSorbo toward the door, Hoy maintains that he merely was trying to position her so that she would go through the door and that Jessica DiSorbo never made contact with the door area. Hill, who followed them as they entered the station, claims that he did not hear any sound indicating that Jessica DiSorbo hit the door area.

Hoy also admits that he bent Jessica DiSorbo forward as he moved her through the station's hallway, but justifies this "come-along move" as a defense tactic which officers are taught as "a method of moving prisoners, handcuffed people, to comply with your direction." Hoy claims that when Jessica DiSorbo tried to kick him again, he placed her on the floor and sat on her leg. Hoy then picked her up, and brought her into the holding cage and handcuffed her to the cell.

Pedersen's version of the events at the station also differs from that of Rebecca DiSorbo. After he arrived at the station in a separate vehicle, Pedersen passed Hill and Rebecca DiSorbo in the station's hallway, at which point, Pedersen states, she kicked him. Hill and Pedersen then physically restrained Rebecca DiSorbo by pinning her down across a sink, and, to use Officer Pedersen's words, "for whatever reason" she fell onto the floor. Pedersen maintains that he never punched or kicked Rebecca DiSorbo as they restrained her on the sink. Pedersen further denies ever choking Rebecca DiSorbo, and claims he never laid a hand on her during the period where they are not visible on the surveillance videotape. Pedersen explains, however, that he and Hill needed to use force

---

4. Criminal charges alleging that Rebecca Di-Sorbo was harassing Pedersen were later dropped.

on Rebecca DiSorbo in the booking room, because "she was violent and combative" and needed to be "physically restrained." Hill maintains that, while he fully appreciated his duty to intervene when another officer engages in excessive force, he never witnessed Pedersen use excessive force on Rebecca DiSorbo.

## C. Rebecca DiSorbo's Injuries

Rebecca DiSorbo's injuries were well documented. Lieutenant Kurt Gerfin, a paramedic with the Schenectady Fire Department, examined Rebecca DiSorbo at the holding cell and subsequently transported her to the emergency room at St. Clare's Hospital, where she remained for a few hours. According to Lieutenant Gerfin's report, Rebecca DiSorbo had two large hematomas on her head. In addition, on December 28, 1998, the day after the incident, Dr. Chester Burton conducted a medical examination of Rebecca DiSorbo. Dr. Burton observed bruises throughout Rebecca DiSorbo's upper body. Pressure point bruises discovered on the top of her neck and behind her ear were consistent with the alleged choking incident. In addition, Dr. Burton found bruises of various sizes on Rebecca DiSorbo's head, right forehead, mandible, right shoulder, hands, left elbow, spine, and the area behind her left ear. None of these injuries required surgery nor did any result in permanent scarring or nerve damage.

## II. Legal Proceedings

On July 22, 1999, Rebecca and Jessica DiSorbo commenced this action against Pedersen, Hoy, and Hill, and against the City of Schenectady. The plaintiffs sought relief pursuant to 42 U.S.C. §§ 1983 and 1988, alleging the defendant officers violated their civil rights, including their rights to be free from excessive force, false arrest, and malicious abuse of process, along with similar pendant state law claims, including battery. The plaintiffs also brought municipal liability claims against the City under *Monell*, alleging that the City had an unconstitutional policy of failing to investigate and act upon allegations of police brutality, that the City failed to train its officers with regard to proper and lawful arrest procedures, and that the City failed to properly supervise or take remedial action against its employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that municipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision).

In a decision and order entered December 20, 2000, the District Court granted the defense's motion to bifurcate the claims against the officers from the claims against the municipality. The court determined that the danger of unfair prejudice weighed in favor of bifurcation, citing the risk that the individual police officer defendants would be prejudiced by the evidence offered against the City of previous incidents of brutality by Schenectady police officers. The court further explained that efficiency considerations supported bifurcation because the plaintiffs' claims of negligent training or supervision against the City required a finding that the defendant officers violated their constitutional rights. To alleviate the potential burden of forcing the plaintiffs to present similar, if not identical, evidence at the *Monell* trial against the City, the court ordered that the two trials proceed back-to-back with the same jury.

Three trials followed. At the first trial on the individual officers' liabilities, which occurred between September 5, 2001 and

September 26, 2001, numerous witnesses testified to the events at the bar and at the station, leading to varying degrees of support for each side's version and much conflicting testimony. The jury returned no findings in favor of the plaintiffs, but returned several findings absolving certain defendant officers. The jury found that: 1) Pedersen did not use excessive force against Rebecca DiSorbo at the Union Inn Bar; 2) Pedersen did not commit battery on Rebecca DiSorbo at the Union Inn Bar; 3) Hill did not falsely arrest Jessica DiSorbo for either disorderly conduct or resisting arrest; 4) Hill did not use excessive force on Rebecca DiSorbo; 5) Hill did not commit battery on Rebecca DiSorbo; 6) Hoy did not use excessive force on Jessica DiSorbo; and 7) Hoy did not commit battery on Jessica DiSorbo. The jury was deadlocked on various claims asserted against Pedersen, namely: 1) whether Pedersen falsely arrested Rebecca DiSorbo for harassment in the second degree; 2) whether Pedersen used excessive force on Rebecca DiSorbo at the police station; 3) whether Pedersen abused process by arresting Rebecca DiSorbo or issuing appearance tickets to her without justification in order to harm her for retaliatory or harassing purposes; and 4) whether Pedersen committed battery on Rebecca DiSorbo at the police station. Because the jury deadlocked on whether Pedersen committed excessive force, the jury did not reach the question of whether Hill failed to intervene in Pedersen's use of excessive force.

The second trial addressed the remaining claims against the individual officers, and occurred from March 4, 2002 through March 18, 2002. After the second trial, the jury found in favor of Pedersen on the false arrest claim, concluding that he did not falsely arrest Rebecca DiSorbo at the Union Inn Bar. The jury, however, found in favor of Rebecca DiSorbo on three of her claims against Pedersen, concluding: 1) Pedersen used excessive force on Rebecca DiSorbo at the police station; 2) Pedersen's actions constituted an abuse of process against Rebecca DiSorbo; and 3) Pedersen committed battery on Rebecca DiSorbo at the police station. With respect to the remaining claim against Hill, the jury found that, although Hill failed to intervene in Pedersen's use of excessive force, he was entitled to qualified immunity.

Before the start of the third trial, the parties addressed the issue of whether the City must indemnify Pedersen for any compensatory and punitive damages. The City alerted the court to related state court proceedings on whether the City must indemnify Pedersen. At the onset of this litigation, Pedersen had requested that the City, through its Corporation Counsel, defend and indemnify him pursuant to a collective bargaining agreement between the City and Pedersen's union. In a letter dated October 19, 2000, Corporation Counsel notified Pedersen that, after an investigation into the events of December 27, 1998, it determined that the City would not pay for defense or indemnification because Pedersen was "acting outside the scope and course of [his] police duties at the time of" the incident, he "acted in derogation of established procedure and in violation of law," and his "actions constitute[d] willful misconduct." Letter from Michael T. Brockbank, Corporation Counsel, to Officer Ronald Pedersen (Oct. 19, 2000), at 2. The Schenectady Police Benevolent Association ("PBA"), on behalf of Pedersen, initiated a proceeding in state court pursuant to Article 78 of the New York Civil Practice Laws and Rules, challenging Corporation Counsel's determination and seeking defense and indemnification pursuant to General Municipal Law § 50–j. In a decision and order dated May 2, 2001, the New York Supreme Court, Schenectady County, (Caruso, *J.*)

dismissed the PBA's petition, concluding that Corporation Counsel's determination was not arbitrary and capricious. *Schenectady Police Benevolent Ass'n v. City of Schenectady*, No. 99–1962 (N.Y.Sup.Ct. May 2, 2001). The District Court, however, in response to a motion by Pedersen which was joined by Rebecca DiSorbo, ordered the City to indemnify Pedersen for all damages, compensatory and punitive, on the basis that he was acting within the scope of his employment. The court made clear that this decision was intended to supersede the state court decision, even though the court stressed that he was bound by New York state law in requiring indemnification.[5] As a result of this indemnification ruling, the District Court subsequently instructed the jury that "any compensatory or punitive damage award assessed by you as against defendant Pedersen will be paid by the City of Schenectady."

The third and final trial, held from April 3, 2002 to April 5, 2002, was on the *Monell* claim against the City and on damages. In support of the City's liability under *Monell*, Rebecca DiSorbo proffered evidence of a police brutality incident, whereby five police officers viciously beat a man named John Rodick while he was naked in his apartment, threw him down a flight of stairs, and then took him to the police station where he spent the night without clothes or medical attention. Rodick's trial against the individual officers resulted in a $2.8 million jury verdict, and Rodick

reached a $1.75 million settlement with the City. Over objection from the City, Rodick was permitted to testify to the verdict and settlement amounts. Rebecca DiSorbo offered evidence that the City took no disciplinary action against the officers involved in Rodick's beating, and even promoted some of the officers to supervisory positions. The jury in the present case found that the City was deliberately indifferent to the need to supervise properly its police officers, and this failure to supervise properly was a cause of the violation of Rebecca DiSorbo's constitutional rights. The jury further found that the City had an unconstitutional practice or custom of its officers using excessive force during arrest, and that practice or custom also was a cause of the violation of Rebecca DiSorbo's constitutional rights.

Finally, the jury addressed the damages to award Rebecca DiSorbo. After receiving an instruction from the court that the City would pay for Pedersen's damages, the jury awarded Rebecca DiSorbo $400,000 in compensatory damages and $625,000 in punitive damages for her excessive force and battery claims, and nominal compensatory damages and $650,000 in punitive damages for her abuse of process claim.

## DISCUSSION

### I. District Court's Ruling Requiring City to Indemnify Pedersen

We begin with the question of who must bear responsibility for the damages

---

5. When the parties debated indemnification before the District Court, the New York Supreme Court's decision was on appeal to the Third Department. The Third Department since has affirmed the Supreme Court's holding that Corporation Counsel's denial of defense and indemnification was not arbitrary and capricious. *Schenectady Police Benevolent Ass'n v. City of Schenectady*, 299 A.D.2d 717, 750 N.Y.S.2d 666, 668–69 (3rd Dept. 2002). The Third Department rejected the

PBA's contention that the appeal had been rendered moot by the District Court's ruling that Pedersen was acting within the scope of his employment. *Id.* at 668. The Appellate Division noted that "the District Court did not address [the City's] statutory duty to indemnify under General Municipal Law § 50–j," but instead limited its findings to separate issue of the City's own liability on a respondeat superior theory. *Id.*

**182**

awarded to Rebecca DiSorbo. As an initial matter, we note that the City is at a minimum jointly and severally liable for compensatory damages pursuant to its liability under *Monell. See White–Ruiz v. City of New York,* 983 F.Supp. 365, 390–92 (S.D.N.Y.1997) (imposing joint and several liability to defendant police officers and a municipality found liable under *Monell*); *see also In re Masters Mates & Pilots Pension Plan & IRAP Litig.,* 957 F.2d 1020, 1027 (2d Cir.1992) ("Under the doctrine of joint and several liability, when two or more persons' torts together cause an injury, each tortfeasor is liable to the victim for the total damages."). The City's liability, however, is limited to Rebecca DiSorbo's compensatory damages, as punitive damages may not be awarded against a municipality under *Monell. See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Morris v. Lindau,* 196 F.3d 102, 112 (2d Cir.1999).

■ In its order and judgment, the District Court found that the City was obligated to indemnify Pedersen for both punitive and compensatory damages "based on representations by defense counsel." This ruling stood in clear contradiction with the New York Supreme Court's decision on the very same indemnification issue. After Corporation Counsel denied Pedersen's petition for indemnification consistent with General Municipal Law § 50-j(6)(a), the Schenectady PBA, on behalf of Pedersen, challenged this administrative determination in state court pursuant to Article 78 of the New York Civil Practice Laws and Rules. In a decision that subsequently was affirmed by the Third Department, *Schenectady Police Benevolent Ass'n v. City of Schenectady,* 299 A.D.2d 717, 750 N.Y.S.2d 666, 668–69 (3rd Dept. 2002), the New York Supreme Court, Schenectady County, held that Corporation Counsel's denial of indemnification was not arbitrary and capricious.

The District Court's reference to "representations by defense counsel" suggests that the City might have bound itself to indemnify Pedersen at trial independent of the contractual duty previously decided in an administrative proceeding and affirmed by state court in an Article 78 proceeding. Based on our review of the record, however, we do not believe that any such representation was made. One could argue that counsel represented that the City would indemnify Pedersen when, after the second trial, counsel for the City moved for the District Court to bypass the *Monell* trial because the court had ruled as a matter of law that Pedersen was acting within the scope of his employment and therefore the City was bound to pay any award. However, *Monell* only reaches compensatory damages so there is no reason to think that counsel was referring to both punitive and compensatory damages. Moreover, it seems likely that counsel for the City was referring to respondeat superior liability rather than indemnification; immediately after the City's statement, counsel for Pedersen sought to bolster the City's argument that a *Monell* trial could be averted, claiming that "Plus, [the City had] agreed to indemnify [Pedersen]." Thus, we do not find support in the record for a finding that counsel for the City created an independent duty to indemnify Pedersen.

■ We thus consider whether the state court decision collaterally estops Pedersen from further arguing that he is entitled to indemnification from the City. Under New York law, collateral estoppel "may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate." *Fuchsberg & Fuchsberg v. Galizia,* 300 F.3d 105, 109 (2d

Cir.2002) (internal citations and quotation marks omitted); *see Grieve v. Tamerin*, 269 F.3d 149, 153–54 (2d Cir.2001); *Schwartz v. Pub. Adm'r*, 24 N.Y.2d 65, 73, 298 N.Y.S.2d 955, 246 N.E.2d 725 (N.Y. 1969). In the case before us, by the time the District Court ordered the City to indemnify Pedersen, Corporation Counsel had determined that it was not required to indemnify Pedersen and the state court had upheld this decision as not arbitrary and capricious in an Article 78 proceeding, at which Pedersen had a full and fair opportunity to litigate his indemnification claim. Furthermore, collateral estoppel is not foreclosed because the New York Supreme Court's decision was being appealed when the District Court ordered indemnification. Under New York law, "the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding." *Amica Mut. Ins. Co. v. Jones*, 85 A.D.2d 727, 445 N.Y.S.2d 820, 822 (2nd Dept. 1981); *see Parkhurst v. Berdell*, 110 N.Y. 386, 392, 18 N.E. 123 (N.Y.1888); *Exch. Nat'l Bank v. Ferridge Props. of New York, Inc.*, 112 A.D.2d 33, 490 N.Y.S.2d 656, 657 (4th Dept. 1985). We therefore conclude that Pedersen is collateraly estopped from arguing that he is entitled to indemnification, and accordingly vacate the court's ruling that the City must indemnify Pedersen for compensatory and punitive damages.[6]

## II. Excessiveness of Compensatory Damages Award

 The jury awarded Rebecca DiSorbo $400,000 in compensatory damages on her excessive force and battery claims. Pedersen and the City argue that this award was excessive, contending that the amount well exceeded compensatory damages awards in cases where plaintiffs suffered comparable injuries.

 We conduct a "narrow" review of a district court's compensatory damages award, limited to "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir.1997) (quotations omitted). Our determination of whether a compensatory damages award is excessive should not be conducted "in a vacuum," but instead "should include consideration of the amounts awarded in other, comparable cases." *Id.* (quotations omitted); *see also Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir.1990). When considering whether a compensatory damages award falls within a reasonable range, we do not "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." *Ismail*, 899 F.2d at 187.

Our analysis begins with the injuries Rebecca DiSorbo endured. Dr. Burton, the physician who examined Rebecca DiSorbo after the incident, testified to the extensive nature and severity of her injuries. According to Dr. Burton's report, Rebecca DiSorbo had bruises on her head, her right forehead, the lower part of her mandible, the area behind her left ear, her right shoulder, her hands, her left elbow, and her spine. In addition, Lieutenant Gerfin, the paramedic who treated Rebecca DiSorbo on December 27, 1998, documented that Rebecca DiSorbo had two hematomas on her head, which he characterized as "large." Rebecca DiSorbo also testified that Pedersen choked her with such aggression that she was unable to breathe and temporarily began to lose

---

6. Because we conclude that the City is not responsible for indemnifying Pedersen, it was incorrect for the court to inform the jurors that the City would pay any compensatory or punitive damages awards against Pedersen.

vision. Rebecca DiSorbo also pursued a claim for psychological injuries she suffered at the time of the incident. While she was handcuffed and defenseless, Rebecca DiSorbo was brutally attacked by a law enforcement officer who was substantially larger and stronger than she.[7] In light of the highly traumatic nature of this attack, it would have been quite reasonable for the jury to find resulting psychological injuries.

Canvassing the awards in comparable cases, as we are bound to do, we conclude that the jury's $400,000 compensatory damages award falls outside a reasonable range of awards. *See Mathie,* 121 F.3d at 813. For instance, in *O'Neill v. Krzeminski,* 839 F.2d 9 (2d Cir.1988), we affirmed an $80,000 compensatory damages award for a victim of particularly egregious police brutality. The plaintiff, who was arrested after being ejected from a nightclub, apparently annoyed several police officers while at the station. As a consequence, the plaintiff, still handcuffed, was struck in the face repeatedly and while bleeding dragged across the detention area by his throat. *Id.* at 10. The plaintiff suffered a fractured nose, lacerations to his forehead and eyebrow, and tenderness in his throat, but experienced no permanent physical disability. *Id.* at 10, 13.

In *Blissett v. Coughlin,* 66 F.3d 531 (2d Cir.1995), we upheld a $75,000 compensatory damages award for a victim of excessive force by prison guards. The plaintiff, an inmate at Attica Correctional Facility, alleged that several prison guards assaulted him, and sought compensatory damages for his physical and emotional injuries. The allegations included that, while the plaintiff was handcuffed, guards punched

him, struck him repeatedly with a baton, kicked him, and choked him until he fell unconscious. *Id.* at 533–34. The plaintiff complained of recurring problems with his right knee as a result of the assault, although this testimony was not substantiated by any independent evidence. *Id.* at 536.

Also instructive is *Hygh v. Jacobs,* 961 F.2d 359 (2d Cir.1992), where we affirmed a $216,000 compensatory damages award for excessive use of force by police officers. The plaintiff in *Hygh* was struck once in the cheekbone by a police officer, apparently with a flashlight or other blunt object. *Id.* at 361. The resulting injuries were quite severe. We explained in *Hygh* that the plaintiff "suffered serious and painful injuries that required surgery under general anesthesia, and the left side of his face is permanently numb." *Id.* at 366.

We also approved a large compensatory damages award for a plaintiff who suffered serious physical injuries in *Ismail.* In that case, the defendant police officer allegedly struck the plaintiff in the back of his head without warning, causing the plaintiff to fall unconscious. *Ismail,* 899 F.2d at 185. The officer then handcuffed the plaintiff, pressed his gun against the plaintiff's head, implanted his knee firmly in the plaintiff's back, and threatened to kill the plaintiff if he attempted to move. *Id.* A subsequent hospital visit revealed that the plaintiff suffered two displaced vertebrae, a cracked rib, and serious head trauma. *Id.* The plaintiff also testified that he continued to suffer from chronic intermittent pain in his arms, torso, and head, and that this pain interfered with his daily activities. *Id.* at 186. The jury awarded $650,000 in compensatory dam-

---

**7.** Pedersen testified that he is a weight lifter who stands six feet tall, weighs 215 pounds, and used to play football. In contrast, according to an incident report completed by

Hill on the date of the attack, Rebecca DiSorbo was five feet, nine inches tall, and weighed only 120 pounds.

ages, but the trial judge ordered the plaintiff to remit $450,000 of this award or face a new trial on damages. *Id.* After reviewing numerous New York cases upholding similar damages awards, we vacated the trial court's order of remittitur, and reinstated the jury's $650,000 compensatory damages award. *Id.* at 186–87.

Two cases in which we found that awards were excessive help further illuminate what is reasonable compensation. In *Bender v. City of New York,* 78 F.3d 787 (2d Cir.1996), the plaintiff suffered "a physical blow to the mouth that resulted in no bruise or cut, much less any permanent injury; 24 hours' confinement in a cell under extremely unpleasant conditions; an additional five hours of custody prior to release at arraignment; the pendency of disorderly conduct and assault charges for six months, prior to their dismissal; and emotional distress to the plaintiff that was manifested by nightmares and occasional loss of sleep over a period lasting a year and a half." *Id.* at 792. We held that the compensatory damages award of $300,000 was excessive and reduced it to $150,000. *Id.* at 792–93. In *Wheatley v. Ford,* 679 F.2d 1037 (2d Cir.1982), we reduced the compensatory damages award from $55,000 to $25,000 where plaintiff was struck by a police officer with a "slapjack," had his bare feet stomped on, and was cuffed in the ear, all producing only temporary injury. *Id.* at 1039–40.

Comparing Rebecca DiSorbo's injuries and subsequent damages award to those in the above cases, we conclude that a $400,000 compensatory damages award is excessive. There is no doubt in our minds that Rebecca DiSorbo's injuries were severe and demand a sizable compensatory damages award. In addition, when considering the sizes of the awards in earlier cases, we must take into account inflation, as the reasonable range for Rebecca Di-Sorbo's injuries today is higher than what it would have been ten years ago. Even so, our caselaw simply does not allow for a $400,000 compensatory damages award for Rebecca DiSorbo's injuries. The plaintiff in *O'Neill* suffered injuries similar in terms of severity to those endured by Rebecca DiSorbo, if not worse, yet that plaintiff received approximately one-fifth of the compensatory damages the jury awarded Rebecca DiSorbo. *See O'Neill,* 839 F.2d at 10, 13. Even taking into account that *O'Neill* was decided approximately fifteen years ago, the disparity between the two compensatory damages awards is considerable. Moreover, Rebecca DiSorbo's injuries also were less severe than those in other cases where we upheld awards closer to the $400,000 range. For instance, Rebecca DiSorbo did not require surgery for her injuries, as did the plaintiff in *Hygh.* Unlike the plaintiffs in *Blissett, Hygh,* and *Ismail,* Rebecca DiSorbo does not complain of any permanent injuries, as most of her bruises healed within several days.

We must keep in mind, however, that in contrast to several earlier cases, the jury in the present case had a valid basis for including Rebecca DiSorbo's psychological injuries in its compensatory damages award, particularly in light of the traumatic nature of the attack. For instance, even though the plaintiff in *Hygh* suffered more serious physical harm, the actual attack in *Hygh* was far less traumatic than the brutality Rebecca DiSorbo endured. *See Hygh,* 961 F.2d at 361; *see also Ismail,* 899 F.2d at 186–87 (reinstating compensatory damages award based on *inter alia* the plaintiff's mental distress, even though the plaintiff did not offer testimony concerning counseling for his mental anguish).

After carefully reviewing Rebecca DiSorbo's injuries and the injuries and awards in the above cases, we conclude that compensatory damages in the amount

of $250,000 for Pedersen's excessive force and battery would appropriately fall within a reasonable range of compensatory damages awards. We therefore remand for a new trial on damages unless Rebecca DiSorbo agrees to remit $150,000 of her excessive force and battery compensatory damages award and accept $250,000 in compensatory damages.

### III. Excessiveness of Punitive Damages Award

 The jury awarded Rebecca DiSorbo a total of $1.275 million in punitive damages against Pedersen, including $625,000 for the excessive force claim and $650,000 for the federal and state abuse of process claims. Pedersen and the City argue that this award was excessive under the factors set forth by the Supreme Court in *BMW of North America v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).[8]

 A jury may "assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). As with compensatory damages, the standard for appellate review of punitive damages awarded under § 1983 considers "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Mathie*, 121 F.3d at 813 (quotations omitted). The Supreme Court in *Gore* identified three "guideposts" for determining whether a punitive damages award is

excessive: 1) the degree of reprehensibility; 2) the disparity between the harm or potential harm and the punitive damages award; and 3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 574–75, 116 S.Ct. 1589. We review a trial court's application of the *Gore* guideposts to a jury award *de novo*. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 443, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). Guided by these standards, we consider each of the *Gore* factors in turn.

### A. Degree of Reprehensibility

 "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. Reprehensibility in this context entails more than merely asking whether the conduct was unacceptable. *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir.1996). The fact that conduct is sufficiently reprehensible so as to trigger tort liability and damages "does not establish the high degree of culpability that warrants a substantial punitive damages award." *Gore*, 517 U.S. at 580, 116 S.Ct. 1589. The Court in *Gore* identified certain aggravating factors to be considered when assessing the degree of reprehensibility: 1) whether a defendant's conduct was violent or presented a threat of violence; 2) whether a defendant acted with malice as opposed to mere negligence; and 3) whether a defendant has engaged in repeated instances of misconduct. *Id.* at 576, 116 S.Ct. 1589.

8. Although the punitive damages were based on violations of both federal and state law, we apply the *Gore* test because it is more generous than New York's "deviates materially" standard for review of punitive damages. *See Gasperini v. Ctr. for Humanities, Inc.*, 518

U.S. 415, 429, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("More rigorous comparative evaluations attend application of [New York C.P.L.R.] § 5501(c)'s 'deviates materially' standard.").

Crediting Rebecca DiSorbo's version of the events at the police station, Pedersen engaged in highly reprehensible conduct that, to some extent, satisfy each of *Gore*'s aggravating factors. Rebecca DiSorbo alleges that Pedersen violently slammed her against the wall, choked her to the point where she began to lose vision, pushed her to the ground, and struck her while she was on the ground. The deliberate nature of these attacks demonstrate that Pedersen was not merely negligent, but was acting with malice toward Rebecca DiSorbo. Further, Rebecca DiSorbo alleges that Pedersen engaged in repeated acts of violence against her at the station. Accordingly, Pedersen's actions were sufficiently reprehensible under *Gore* to justify punitive damages.

**B. Disparity Between Harm and Punitive Damages Award**

■ To assess the appropriateness of the ratio of the punitive damages award to the harm, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *Gore*, 517 U.S. at 581, 116 S.Ct. 1589 (quotation marks and emphasis omitted). This consideration requires courts to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm Mut. Auto. Ins. Co. v. Campbell*, —— U.S. ——, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003). Our reasonableness determination does not entail a "simple mathematical formula," as there may be cases where "a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582, 116 S.Ct. 1589; *see Lee*, 101 F.3d at 810–11 (refusing to rely on a mathematical multiplier to assess the reasonableness of

the award where the compensatory award was nominal).

Consideration of the disparity between the punitive damages award and the harm provides minimal assistance in the instant case. For example, if we assume that Rebecca DiSorbo remits to yield a $250,000 compensatory damages award for the excessive force claim, the ratio between compensatory and punitive damages would be 2.5-to-1, which would not appear to be an unreasonable ratio. If we look at the abuse of process claim, however, the jury awarded only nominal compensatory damages, yielding a staggering 650,000-to-1 ratio of punitive damages to compensatory damages. We therefore conclude that "the use of a multiplier to assess punitive damages is not the best tool here." *Lee*, 101 F.3d at 811.

**C. Difference Between Remedy and Civil Penalties in Comparable Cases**

The final *Gore* factor compares the punitive damages award with the civil and criminal penalties for comparable misconduct. *Gore*, 517 U.S. at 583, 116 S.Ct. 1589. The rationale for this consideration is that, if the penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lacked fair notice that the wrongful conduct could entail a sizable punitive damages award. *Lee*, 101 F.3d at 811.

The most relevant crime in New York would likely be assault in the third degree, which is a class A misdemeanor. N.Y. Pen. L. § 120.00 ("A person is guilty of assault in the third degree when: 1. With intent to cause physical injury to another person, he causes such injury to such person .... Assault in the degree is a class A misdemeanor."). A class A misdemeanor carries a maximum sentence of one year,

*id.* at § 70.15[1], and a maximum penalty of one thousand dollars, *id.* at § 80.05[1]. While a year's imprisonment is undoubtedly a substantial punishment, a maximum fine of $1,000 gives little warning that the action could result in a $1.275 million punitive damages award. *See Lee,* 101 F.3d at 811.

As we noted in *Lee,* however, criminal penalties understate the notice when the misconduct is committed by a police officer. *Lee,* 101 F.3d at 811. We assumed in *Lee* "that [the defendant officer's] training as a police officer gave him notice as to the gravity of misconduct under color of his official authority, as well as notice that such misconduct could hinder his career." *Id.* Still, in *Lee* the court concluded that this guidepost weighed in favor of finding the $200,000 punitive damages award to be excessive. The court explained that, notwithstanding the officer's notice as to the gravity of his actions, "nothing could conceivably have prepared him for a punitive damage award amounting to the sacrifice of the better part of a policeman's after-tax pay for a decade." *Id.*

### D. Totality of *Gore* Factors

Police brutality cannot be tolerated in our society, and punitive damages awards serve a critical role in deterring such misconduct. *See State Farm Mut. Auto. Ins. Co.,* —— U.S. at ——, 123 S.Ct. at 1519 ("By contrast [to compensatory damages], punitive damages serve a broader function; they are aimed at deterrence and retribution."). Pedersen abused a position of respect and authority to commit malicious and repeated acts of violence against a vastly weaker and helpless victim. We are thoroughly convinced that this conduct was sufficiently reprehensible to justify some degree of punitive damages. There must, however, be an upper limit to that award, and after carefully evaluating the *Gore*

factors, and taking into consideration the sizable compensatory damages award Rebecca DiSorbo would receive if she remits, we are compelled to conclude that the $1.275 million punitive damages award exceeded that limit. *See id.* at 1526.

To determine the appropriate level of punitive damages, we assess such awards in other police misconduct cases. *See Lee,* 101 F.3d at 812. The defendant officer in *Lee* struck the plaintiff, who was handcuffed, eight or nine times in the head with his police baton, to the point where the plaintiff was knocked unconscious and had to be hospitalized. *Id.* at 807–08. Although similar to the instant case, the brutality of these strikes seems to have been more severe than those inflicted by Pedersen on Rebecca DiSorbo, as Pedersen did not use a weapon and did not beat her to the point of unconsciousness. After weighing the *Gore* factors, we determined in *Lee* that the jury's $200,000 punitive damages award was excessive, and ordered a new trial unless the plaintiff agreed to remit $125,000, and accepted a $75,000 punitive damages award. *Id.* at 813.

In *Ismail,* we upheld a $150,000 punitive damages verdict. As discussed *supra,* the defendant officer in *Ismail* struck the plaintiff in the side of the head without warning, causing him to lose consciousness, pressed his gun against the plaintiff's head, implanted his knee into the plaintiff's back, and threatened to kill the plaintiff. *Ismail,* 899 F.2d at 185. The officer's conduct in *Ismail* appears to have been even more reprehensible than the conduct in our case. While Rebecca DiSorbo suffered a heinous attack at the hands of Pedersen, Pedersen did not beat Rebecca DiSorbo to the point of losing consciousness, never brandished a firearm, and never threatened her life.

We find further guidance from *O'Neill,* where we upheld a $185,000 punitive damages award for the brutal beating by several police officers of a defenseless plaintiff at a police station. The plaintiff, while handcuffed and unable to defend himself, was struck repeatedly in the face and head, with at least one blow struck by using a blackjack. *O'Neill,* 839 F.2d at 10. An officer "then dragged [the plaintiff] by the throat across the detention area, castigating him for 'bleeding all over my floor.'" *Id.* Pedersen's use of excessive force was of a different order than the beating inflicted by the officers in *O'Neill.* Moreover, the jury in the case before us only found liability based on a single officer's misconduct, rather than several officers as was the situation in *O'Neill.*

■ Upon careful review of misconduct in these cases, we are compelled to conclude that a punitive damages award of $75,000 more accurately reflects the severity of Pedersen's acts under the *Gore* guideposts. We therefore remand for a new trial on punitive damages, unless Rebecca DiSorbo agrees to remit $1.2 million, yielding a $75,000 punitive damages award, which is comparable to the upper limits of the punitive damages awarded in similar police brutality cases.[9]

### CONCLUSION

We have considered all of the arguments raised by the parties in the direct appeal and cross-appeal. We affirm in full with respect to the liability of the defendants. We vacate the District Court's conclusion that the City must indemnify Pedersen and vacate the compensatory and punitive damages award. Unless Rebecca DiSorbo agrees to accept $250,000 in compensatory damages and $75,000 in punitive damages, which would entail remitting $150,000 of the compensatory damages award and $1.2 million of the punitive damages award, we order a new trial on damages.

---

9. If there is a new trial on punitive damages, and in light of our earlier holding that the District Court erred in requiring the City to indemnify Pedersen for punitive damages, we note that the District Court should admit evidence of Pedersen's financial situation. "[O]ne purpose of punitive damages is deterrence, and that deterrence is directly related to what people can afford to pay." *Lee,* 101 F.3d at 813 (citing *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992)); *see City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (noting that "evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded").