**09-5201-cv**
**Payne v. Jones**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**


August Term, 2010


(Argued: December 14, 2010    Decided: October 3, 2012    Amended: February 15, 2013)


Docket No. 09-5201-cv


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JAMES EDWARD PAYNE,

    *Plaintiff - Appellee*,

v.

OFFICER BRANDON JONES,

    *Defendant - Cross Claimant - Appellant*

CITY OF UTICA,

    *Defendant - Cross Defendant - Appellant*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


Before: JACOBS, *Chief Judge*, McLAUGHLIN and LEVAL, *Circuit Judges*.

   Defendant Officer Brandon Jones appeals from a judgment of the United States District Court for the Northern District of New York (Hurd, *J.*), entered pursuant to a jury verdict, awarding compensatory and punitive damages to Plaintiff James Edward Payne on claims of excessive force and battery against the defendant police officer. Defendant Jones challenges the

district court's denial of a continuance after a medical emergency prevented him from attending the first three days of the five-day trial. He also contends that the $300,000 punitive damages award is excessive. The Court of Appeals (Leval, *J.*) concludes that the district court did not exceed its discretion in denying the continuance, but concludes that the punitive damages award is excessive. Accordingly, the punitive damages award is **VACATED**, and the case is **REMANDED** for a new trial on punitive damages, unless Plaintiff agrees to accept a reduced punitive damages award totaling $100,000.

FRANK POLICELLI, Utica, NY, for *Appellee*.

PATRICK G. RADEL, Getnick Livingston Atkinson & Priore LLP, Utica, NY (Michael E. Getnick, *on the brief*), for *Cross Claimant - Appellant*.

Linda S. Fatata, Corporation Counsel, Utica, NY (Armond J. Festine, Assistant Corporation Counsel, *on the brief*), for *Cross Defendant - Appellant*.

LEVAL, *Circuit Judge*:

Defendant Brandon Jones, a former officer in the Utica Police Department, appeals from the judgment of the United States District Court for the Northern District of New York (Hurd, *J.*), entered pursuant to a jury verdict, awarding compensatory and punitive damages to Plaintiff James Edward Payne on his claims against Jones of excessive force and battery. Jones contends that the district court erred in denying a continuance to accommodate his inability to attend the first three days of the five-day trial due to a medical emergency. Jones also argues that the $300,000 punitive damages award is excessive.

We conclude that the district court did not exceed its discretion in refusing to grant a continuance because the court's decision was neither arbitrary nor prejudicial to Jones's defense. On the other hand, we agree with Jones that the punitive damages award of $300,000 is excessive, and we conclude that a reduced award of $100,000 would more accurately reflect the

2

severity of Jones's misconduct. We therefore remand for a new trial on punitive damages, unless Payne agrees to remit $200,000 and accept a punitive damages award totaling $100,000.[1]

**BACKGROUND**

We view the facts in the light most favorable to Payne, who was the prevailing party at the jury trial below. *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 195 (2d Cir. 2004). Payne is a decorated Vietnam War veteran who suffers from severe post-traumatic stress disorder as a result of his military service. In the early morning hours of September 11, 2007, Payne was taken by his wife and son to the emergency room at Faxton-St. Luke's Healthcare hospital after accidentally cutting his thumb. Payne was combative and disoriented when he arrived at the emergency room.

Because of Payne's combativeness, responding officers Brandon Jones and John Abel placed him under arrest pursuant to N.Y. Mental Hygiene Law § 9.41, which authorizes the arrest of a person who appears to be mentally ill and acts in a manner likely to result in serious harm to himself or others. The officers called for an ambulance to transport Payne to St. Elizabeth Medical Center, the nearby hospital assigned to receive people arrested under § 9.41. While a paramedic was examining Payne, Jones slapped the side of Payne's head. After a struggle in which Payne resisted the officers' efforts to handcuff him and place him on a gurney, Payne was loaded into the ambulance and taken to St. Elizabeth. Jones followed the ambulance in his squad car.

---

[1] The City of Utica, a defendant at trial and an appellant and cross defendant on appeal, contends that it is not obligated to indemnify Jones for the award of punitive damages. This argument is without merit and is disposed of in a summary order filed concurrently with this opinion.

3

At St. Elizabeth, Payne resisted Jones's efforts to move him from the ambulance gurney into an individual room in the emergency room's mental health unit. Jones wrapped Payne in a bear hug and pushed him into the room. As Jones was placing Payne on the bed, he noticed Payne's Marine Corps tattoos and said "Marines are pussies." In response, Payne kicked Jones in the groin area. Jones reacted by punching Payne in the face and neck seven to ten times and kneeing him in the back several times. Payne, who was still handcuffed, defended himself by putting his hands up to cover his face and rolling on the bed to turn his back toward Jones. A nurse rushed forward and grabbed Jones, who then stopped punching Payne. The attack lasted 30 seconds or less. A doctor examined Payne and found that his face was bloody and swollen, and that his upper back was reddened. Payne later testified at trial that the beating aggravated his existing back pain and his post traumatic stress disorder. There was no evidence of any other injury.

The doctor reported Jones to the Utica Police Department, which conducted an investigation into the attack. The Department's Professional Standards Unit found that Jones had committed an egregious assault on Payne and had lied about the incident to police investigators. Ultimately, Jones was terminated.

On February 7, 2008, Payne brought a civil action in the United States District Court for the Northern District of New York against Jones, the City of Utica, Abel, and the chief of the Utica Police Department. Payne alleged under 42 U.S.C. § 1983 that Jones used excessive force in violation of the Fourteenth Amendment. Payne also alleged that Jones had committed a battery in violation of state law. A jury trial was scheduled to begin on September 14, 2009.

4

At about 5:00 a.m. on September 14, Jones checked in to St. Luke's hospital complaining of bleeding and an inability to control his bowels. Jones's attorney, Michael Getnick, Esq., informed the court that Jones would be kept under observation for "at least two days," and that surgery was a possibility. *Payne v. Jones*, No. 09-5201, Joint Appendix ("JA") 66 (Aug. 16, 2010). Getnick asked the court to delay the trial indefinitely to "wait to see what the doctor's prognosis is, and what the schedule is to see if he will be confined, and if so, for how many days . . . ." JA 67. Getnick acknowledged that, at that point, his only source of information was Jones's wife, but he offered to provide a treating doctor's affidavit describing his client's condition. Payne's counsel opposed a continuance, asserting that Jones would not be prejudiced if the trial proceeded in his absence. The district court decided to proceed with jury selection and opening statements, but it delayed the start of testimony until the next day, September 15, to give Getnick an opportunity to submit a medical affidavit. Getnick then asked the court to inform the venire members that Jones was in the hospital. The court declined to mention the hospitalization without evidence that Jones was indeed at the hospital. Instead, the court told the venire members that Jones "is not here today through no fault of his own. We hope—he wanted to be here, and we hope he will be . . . ." JA 69.

After the jury was impaneled and the opening statements were delivered, the court dismissed the jury for the day. Getnick then presented the court with a doctor's affidavit, which described Jones's illness and indicated that Jones might recover sufficiently to be able to attend the trial by September 15 or 16 so long as he continued to improve and did not require surgery. *See* JA 89. The district court stated that the trial would resume the following morning, September 15, in the absence of further updates about Jones's status.

Before calling in the jury on the morning of September 15, the court inquired into Jones's availability. Jones's attorney reported that he did not think that his client would be able to attend the trial that day because "the doctors are not in agreement" about whether Jones would need surgery. JA 91. Getnick continued: "So I think they will make a decision this morning. . . . [T]hree doctors . . . are making the decision, the surgeon, the internist, and the gastroenterologist." JA 91. The court acknowledged this information and summoned the jury. Payne began presenting his case. He called, among others, the doctor and the nurse who had witnessed the attack at St. Elizabeth to testify.

The next day, September 16, the court again asked for an update on Jones before summoning the jury. Jones's attorney said his client was expected to be released that afternoon or evening, and would be present either September 17 or 18. He said that he was "hopeful that [Jones] will be in court and ready to testify on" September 18, as long as Jones "has been weaned off the medication that he is on." JA 136. The district court again decided to proceed with the trial. Payne called a few more witnesses and rested. The parties and the court then agreed that, in view of Jones's unavailability, Abel would put on his defense first. The court explained to the jury that Abel would be presenting his defense out of order because "Mr. Jones became ill Sunday evening, and it was too late to call off the trial . . . . [W]e have learned that he will be available either tomorrow afternoon or Friday [September 18] morning to be here and testify." JA 169. The court then told the jury that, if Jones was still unable to testify on September 18, Jones's attorney would be given permission to read the entire transcript of Jones's pretrial deposition.

6

Jones was present at the trial the following day, September 17. The court introduced him to the jury members, reminding them that, "as I told you yesterday afternoon, Mr. Jones was somewhat ill for a couple of days, and I confirmed that he was, in fact, ill so there is no question, but he has now fortunately joined us. And, Mr. Jones, would you please stand so that the jury can — okay." JA 196. That same day, Jones took the stand to testify in his own defense. The court prohibited Getnick from asking about the nature and extent of Jones's illness, explaining that "the jury has been advised that he was ill the last couple of days and confirmed. We don't need to get into any details . . . . It is irrelevant." JA 208. Getnick then asked that Jones be allowed to say that he had been in the hospital, but the court denied this request on the ground that mentioning the hospital might cause the jury to feel sympathy for Jones and unfairly prejudice Payne. After summoning the jury, the district court explained: "Members of the jury, the next witness will be the defendant, Brandon Jones. I want to emphasize for you that the last couple of days I have confirmed that he was ill, and he wanted to attend this trial. He was unable to be here because of his physical condition for the last two or three days. . . . I am instructing you that you should not in any way hold it against him because he was not here for the first couple of days of trial." JA 209.

Witness testimony concluded on Friday, September 18, and the court charged the jury. On September 21, the jury returned a verdict finding that Jones had used excessive force in violation of the Fourteenth Amendment and had committed battery in violation of state law. The jury awarded Payne $60,000 in compensatory damages and found that he was entitled to punitive damages. Abel was found not liable.

The court reconvened the jury on September 24 to determine the amount of punitive damages. Stephen Dolan, a prisoner at Oneida County Jail, testified that Jones had used excessive force against him in 2004. Dolan stated that he had been ejected from a restaurant and was sitting in the lobby waiting for a bus when Jones and another officer approached him and asked to see identification. Dolan complied and Jones then began to pat him down. After Dolan protested, Jones struck him in the face and knocked him to the ground, causing injuries that required four stitches. Dolan was then placed under arrest for disorderly conduct and resisting arrest. Two police officers called by Jones disputed Dolan's version of events. They testified that Dolan had resisted arrest and that Jones had used appropriate force to subdue him. The jury returned a verdict awarding Payne $300,000 in punitive damages.

Jones moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial pursuant to Rule 59. JA 308. Jones contended that the court had erred in denying his request for a continuance, which resulted in him missing three of the five days of trial. The court denied the motion, stating that it found no prejudice to Jones. The court also noted that witnesses scheduled to testify for Payne, including a doctor and a nurse, "would have been difficult to reschedule." JA 309.

Jones also argued that the jury's awards of compensatory and punitive damages were excessive and should be set aside. The court, however, found that the awards were within permissible bounds because the beating was "severe," the victim was defenseless and mentally ill, and the assailant was a police officer who had used excessive force in the past. JA 309. With respect to the punitive damages award, the court added that "the five to one ratio of punitive to compensatory damages is reasonable." JA 309.

8

**DISCUSSION**

**I. Denial of the Continuance**

A party's demand for an adjournment of a civil trial until the party can make a personal appearance "is entrusted to the sound discretion of the trial judge." *Davis v. United Fruit Co.*, 402 F.2d 328, 330 (2d Cir. 1968); *see also United States v. Cusack*, 229 F.3d 344, 349 (2d Cir. 2000) (per curiam) ("A district court has broad discretion to grant or deny a motion for a continuance."). "This Court will affirm orders denying continuances unless there is a showing both of arbitrariness and of prejudice to the defendant." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 100 (2d Cir. 2001). Because we find neither arbitrariness nor prejudice, we reject Jones's claim of entitlement to a retrial based on the court's refusal to grant him an adjournment of trial.

Jones has made no persuasive showing that he suffered any significant prejudice. As an initial matter, we note that the absence of a party from part or all of a civil trial is not *per se* prejudicial. *See, e.g.*, *Lamb v. Globe Seaways, Inc.*, 516 F.2d 1352, 1353 (2d Cir. 1975) ("This Circuit has consistently upheld the practice of denying trial continuances in cases in which a party or a witness was absent from the trial."); *United Fruit*, 402 F.2d at 330 (where the absent plaintiff's deposition was used by his counsel in place of his live testimony, court rejected plaintiff's claim that "his case was not presented 'in its best light' because of the court's refusal to grant a continuance until [he] could make a personal appearance at his trial").

In *Morrissey v. National Maritime Union of America*, 544 F.2d 19 (2d Cir. 1976) (Friendly, *J.*), one of the defendants in a civil lawsuit fell seriously ill a few days before the jury trial. *See id.* at 31. The district court denied his motion for a continuance, and he ultimately

missed the entire trial. *See id.* Given the defendant's absence, the court allowed the defendant's pretrial deposition, which had been taken by the plaintiff, to be read in its entirety. *See id.* Although claiming prejudice, the defendant failed to identify anything he would have testified to that was not included in the deposition testimony that was read to the jury. Noting that the "deposition seem[ed] to have covered the very topics on which [the defendant's] live testimony presumably would have been most helpful to the defense," *id.* at 32, we concluded the defendant had failed to establish any prejudice.

Jones, unlike the defendant in *Morrissey*, was present for two of the five days of trial and took the stand in his own defense. He was able to provide all his material testimony to the jury in person.[2] He makes no contention that his absence during the early days of trial in any way impaired his ability to give testimony that would have aided his defense.[3]

Jones contends he was prejudiced because the jurors must have formed unfavorable "first impression[s]" of him from seeing his "empty chair" for three days, and that those negative impressions "ultimately resulted in a finding of liability and a punitive damages award." Def. Jones Br. at 24-25, 31. He asserts that the district court then exacerbated this prejudice by refusing to tell the jury that he was hospitalized and describing him instead as "somewhat ill," which may have raised doubts in the jurors' minds about the legitimacy of his absence.

---

[2] On the third day of trial, the district court indicated that, if Jones was unable to testify on the fourth or fifth days, Jones's attorney would be allowed to "read to [the jury] the entire deposition under oath of Mr. Jones or if he has a transcript of any other proceedings of Mr. Jones where he gave testimony under oath . . . ." JA 169.

[3] Jones also makes no contention that his absence during the testimony of plaintiff's witnesses made him unaware of materially inaccurate aspects of their testimony that he could have rebutted.

10

We disagree. The court protected against any negative impressions that the jurors might have formed by telling them several times that Jones was absent involuntarily due to illness. *See* JA 69 (noting at the start of jury selection that Jones could not attend "through no fault of his own"); 169 (explaining that Jones had fallen "ill"); 196 (same); 209 (same, and specifically instructing the jury not to hold Jones's absence against him). We find no error in the court's decision to omit details of Jones's illness and to bar him from testifying about the nature of his illness. As the court observed, such details could evoke sympathy for him, thereby unfairly prejudicing Payne, and would raise irrelevant disputed areas that would distract the jurors from what was properly in controversy.

Jones argues further that the denial of the continuance prevented him from assisting his attorney during the jury selection and the cross-examinations of Payne's witnesses. It is sufficient response that Jones identifies no respect in which he would have improved his attorney's effectiveness in either undertaking. *Cf. United States v. Seschillie*, 310 F.3d 1208, 1217 (9th Cir. 2002) (rejecting the defendant's argument that an expert excluded by the district court was needed to advise counsel because the defendant "has not identified any missed avenues of cross-examination which would have been potentially fruitful"); *Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 629 n.2 (4th Cir. 1996) (rejecting a party's argument that an expert sequestered by the court was needed to advise counsel on the ground that the party failed to show any specific harm that resulted from the sequestration).

Nor do we find any abuse of discretion in the trial court's handling of the issue, especially in view of Jones's failure to make a persuasive showing to the trial court of any respect in which he would be prejudiced by denial of the continuance. The request for a

11

continuance was made by Jones's attorney only moments before the start of jury selection on the first day of trial, and was based solely on what Jones's wife had told the attorney. There was no confirmation of any kind from more reliable sources; nor was there a showing that time had prevented securing more reliable information. *Cf. Lopez v. Aransas Cnty. Indep. Sch. Dist.*, 570 F.2d 541, 544 (5th Cir. 1978) ("The trial court's denial of plaintiff's eleventh-hour oral motion for a continuance was well within its discretion . . . ."). The court was further justified by the difficulty of rescheduling the appearance of the healthcare professionals who were scheduled to testify for the plaintiff, as well as by the uncertainty as to when Jones would be able to return to court.

Trial courts "necessarily require a great deal of latitude in scheduling trials" because trials are difficult to administer from a logistical and organizational standpoint. *Morris v. Slappy*, 461 U.S. 1, 11 (1983). "Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time . . . ." *Id.* The Supreme Court has recognized that the existence of all these complexities "counsels against continuances except for compelling reasons." *Id.* Because continuances can be highly disruptive to the courts and the parties, especially when granted close to the start of trial, *see, e.g.*, *United States v. Rivera*, 900 F.2d 1462, 1475 (10th Cir. 1990) ("[A]ny continuance granted practically on the eve of trial inevitably will disrupt the schedules of the court, the opposing party, and the witnesses who have been subpoenaed or who have voluntarily arranged their schedules to attend the trial. When, as here, a jury trial is involved, there is additional potential inconvenience to jurors and to the court."); *cf. Moffitt v. Ill. State Bd. of Educ.*, 236 F.3d 868, 873 (7th Cir. 2001) ("One naturally expects the plaintiff to be present and ready to put on her case when the day of trial arrives. . . .

[T]rial dates—particularly civil trial dates—are an increasingly precious commodity in our nation's courts."), trial courts are entrusted with broad discretion to decide whether the stated purpose of a continuance warrants the disruption and delay of granting one, *see Slappy*, 461 U.S. at 12. And when we review the denial of a continuance, "[w]e ask not what we ourselves might have done, but whether the district judge abused his discretion in deciding to act as he did." *Moffitt*, 236 F.3d at 873.

In conclusion, we find neither prejudice nor arbitrariness in the trial court's decision to proceed with the trial in Jones's absence.

## II. Excessiveness of the Punitive Damages Award

Jones claims that the $300,000 punitive damages award to Payne was excessive and should be set aside. We agree that the award is excessive, and we remand for a new trial on punitive damages unless Payne accepts a reduced award of $100,000.

A. *Role of Courts in Reviewing Jury Awards of Punitive Damages*

Awards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct. Nor is there any formula to determine the dollar amount needed to effectuate deterrence. *See Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) ("[I]t is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary."); Robert D. Cooter, *Economic Analysis of Punitive Damages*, 56 S. Cal. L. Rev. 79, 79 (1982) ("There is no clear standard . . . for computing [the] magnitude [of punitive damages] when awarded.").

13

Even if there is no such thing as a *correct* amount of punitive damages, a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 499 (2008) ("Courts of law are concerned with fairness as consistency . . . ."); *id.* at 502 ("[A] penalty should be reasonably predictable in its severity . . . . [T]he penalty scheme [similarly situated tortfeasors] face ought to threaten them with a fair probability of suffering in like degree when they wreak like damage."). When a jury undertakes to set the amount of a punitive damages award, it has nothing to rely on other than the instincts of the jurors and random, often inaccurate, bits of information derived from press accounts or word of mouth in the community about how such intangibles have been valued in other cases. *See Cooper Indus., Inc. v. Leatherman Tool Grp.*, 532 U.S. 424, 432 (2001) (a jury's "imposition of punitive damages is an expression of its moral condemnation," rather than an exercise of fact-finding); *id.* at 439 ("it is clear that juries do not normally engage in [] a finely tuned exercise of deterrence calibration when awarding punitive damages"). Having no objective standards to guide them, and understandably outraged by the bad conduct of the defendant, jurors may be impelled to set punitive damages at any amount. Regional biases against particular companies, furthermore, may fuel unreasonable awards. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994) (expressing concern that "juries will use their verdicts to express biases against big businesses, particularly those without strong local presences"). The Supreme Court observed as a caution that punitive damages serve the same purposes as criminal penalties, but are imposed in civil proceedings in which the defendants do not receive the protections afforded to criminal defendants. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Juries that make such awards are unlikely to have

14

sufficient information about an individual defendant's personal finances to allow for a fair and sensitively tailored punishment.  Excessive awards against individuals can inflict great harm not only on the wrongdoer, but also on the wrongdoer's innocent dependents and, upon bankrupting a family, can inflict further charges on the public treasury.  *See Southerland v. City of New York*, 681 F.3d 122, 137 (2d Cir. 2012) (Jacobs, *C.J.*, dissenting from denial of rehearing *in banc*).

Apart from impairing the fairness, predictability and proportionality of the legal system, judgments awarding unreasonable amounts as damages impose harmful, burdensome costs on society.  As an initial matter, an excessive verdict that is allowed to stand establishes a precedent for excessive awards in later cases.  The publicity that accompanies huge punitive damages awards, *see, e.g.*, Henry Weinstein, *Philip Morris Ordered to Pay $28 Billion to Smoker*, L.A. Times, Oct. 5, 2002, will encourage future jurors to impose similarly large amounts.  Unchecked awards levied against significant industries can cause serious harm to the national economy. Productive companies can be forced into bankruptcy or out of business.  Municipalities can be drained of essential public resources.  The threat of excessive damages, furthermore, drives up the cost of insurance premiums,[4] deters both individuals and enterprises from undertaking socially desirable activities and risks,[5] and encourages overspending on "socially excessive

---

[4] We recognize that punitive damages are not insurable in all states.  *See, e.g.*, 7 Couch on Ins. § 101:28 (3d ed. 2007) (collecting cases); 2 Barry R. Ostrager & Thomas R. Newman, Handbook on Ins. Coverage Disputes § 14.02(b) (16th ed. 2012) (reviewing public policy considerations).  However, many states allow punitive coverage and "the legislative and judicial trend in the past several decades has been squarely in the direction of expanded insurability." Catherine M. Sharkey, *Revisiting the Noninsurable Costs of Accidents*, 64 Md. L. Rev. 409, 430 (2005); *see also* Michael A. Rosenhouse, *Liability Insurance Coverage as Extending to Liability for Punitive or Exemplary Damages*, 16 A.L.R. 4th 11, § 5 (2011) (collecting cases).

[5] One well-known example was the shortage of obstetricians because of high malpractice insurance premiums resulting from large jury damages awards.  *See, e.g.*, Marilyn Elias,

15

precautions" that "cost[] more than the reduction of harm produced by [them]." A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 869, 879 (1998). The prices of goods and services will rise, and innovation will be inhibited. *See id.* at 873.

These burdens on society, furthermore, are not justified by the benefits to the plaintiffs. Because punitive damages are awarded over and above full compensatory damages to cover a plaintiff's actual losses, punitive damages have been characterized as "a windfall to a fully compensated plaintiff." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981). *But see Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 804 (5th Cir. 1983) (Wisdom, *J.*) ("To further the objectives of punishment and deterrence, it is more important that a defendant pay for his wrongdoing than that the plaintiff receive the payment."); Catherine M. Sharkey, *Punitive Damages as Societal Damages*, 113 Yale L.J. 347, 363-70 (2003) (deterrence goal of punitive damages may be better served by large punitive damages awards, because victims fail to bring suit innumerable reasons, leading to "underliability" for wrongdoers). Indeed, the logic of giving a single plaintiff the money exacted to punish and deter misconduct affecting the community is vulnerable to criticism. In terms of fairness among potential plaintiffs, excessively large punitive damages awards could bankrupt defendants before other deserving plaintiffs have had the opportunity to recover compensatory damages. *See, e.g.*, James B. Sales & Kenneth B. Cole, Jr., *Punitive Damages: A Relic that Has Outlived Its Origins*, 37 Vand. L. Rev. 1117,

---

*Obstetricians Dwindle Amid High Malpractice Costs*, USA Today, May 6, 2002, http://www.usatoday.com/news/health/2002-05-06-obstetricians.htm; Jaime Holguin, *High Cost of Malpractice Insurance*, CBSNews.com, Dec. 5, 2007, http://www.cbsnews.com/2100-500262_162-610102.html.

1154-55 (1984). At a societal level, the community benefits from the deterrent effect of such awards, but not from the actual money. If the tortfeasor had been assessed a fine instead, the money would have gone to a public purpose. *Cf. Ciraolo v. City of N.Y.*, 216 F.3d 236, 247 (2d Cir. 2000) (Calabresi, *J.*, concurring) ("[I]n order to achieve the goal of social compensation, as well as the goal of optimal deterrence, it would be preferable if such damages were paid into a fund that could then be applied to remedy some of the unredressed social harm stemming from the defendant's conduct.").[6] The burden of punitive damages, furthermore, does not even necessarily fall on the wrongdoer, who may benefit from a program of indemnification. When, as here, the wrongdoer is a public servant and receives indemnification for a court's award of damages, it is the taxpaying public that bears the brunt of an excessive award, which compounds the injury done by the tortfeasor.[7]

---

[6] A confiscatory tax on punitive damages and related contingency fees, or the diversion of damages to the public fisc, would do much the same. Several states have enacted split-recovery statutes that allocate a percentage of punitive damages awards to the state treasury or a specified fund, presumably for this very purpose. *See, e.g.*, Alaska Stat. Ann. § 09.17.020(j) (fifty percent of punitive damages award paid to general fund of the state); Ind. Code Ann. § 34-51-3-6(c) (seventy-five percent of punitive damages award paid to violent crime victims compensation fund). Other states give courts discretion to apportion awards between the plaintiff and the state. *See, e.g.*, *Dardinger v. Anthem Blue Cross & Blue Shield*, 781 N.E.2d 121, 145-46 (Ohio 2002) (conditioning $30 million punitive damages award on plaintiff's acceptance of $10 million with the remainder, less attorneys' fees, allocated to a cancer research fund established by the court). For criticisms of this approach, see *Life Ins. Co. of Ga. v. Johnson*, 684 So. 2d 685, 707-11 (Ala. 1996); Catherine M. Sharkey, *Punitive Damages as Societal Damages*, 113 Yale L.J. 347, 424-25 (2003).

[7] Public servants are sometimes not indemnified by their employers for punitive damages. *See Patterson v. Balsamico*, 440 F.3d 104, 122 (2d Cir. 2006); *Vasbinder v. Scott*, 976 F.2d 118, 122 n.1 (2d Cir. 1992) ("In this case . . . the State of New York has taken the position in its brief and oral argument on appeal that it may indemnify the defendants but is not required to do so, and has not made a commitment to provide indemnification."); *cf. O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988) (city of New Haven accepted responsibility for payment of punitive damages awarded against a New Haven police officer pursuant to a municipal indemnification agreement).

While judges have no greater ability than jurors to determine any *correct* amount of punitive damages (as there is no such thing as a correct amount), judges do have far greater familiarity with the experience of the legal system, which includes not only the large awards that have been the subject of well publicized appeals, but also small awards that are not appealed and therefore cannot easily be found in public sources. Judges have a better awareness than do juries whether a particular award is consistent with the norms that prevail in that system. And while judges do not necessarily have any greater expertise than jurors as economists, and cannot necessarily better assess the point at which punitive damages become excessive and cause harm to the economy, it would be catastrophically expensive and impractical to have the parties in every tort trial call economists as expert witnesses to educate the jury on the consequences of punitive damages to the overall economy. Responsibility to appraise these matters of necessity falls on the courts even if they lack expertise in economics and feel ill equipped to make such evaluations.

The courts, accordingly, bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to those desiderata and are not excessive. An instrument available to courts to achieve that goal is the order of remittitur, which sets aside an award, ordering a new trial, unless the plaintiff agrees to accept a lesser amount. *See, e.g.*, *Blunt v. Little*, 3 F. Cas. 760, 761-62 (C.C. Mass. 1822) (No. 1,578) (Story, *J.*) ("[I]f it should clearly appear that the jury . . . have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case."). "Judicial review of the size of punitive damages awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded." *Honda Motor*, 512 U.S. at 421.

18

*B. The Standards Governing Excessiveness and Appellate Review*

While the jury's punitive damages award is at the heart of the appeal, technically the appeal is directed not against the jury's decision but against the decision of the district court in denying the defendant's motion to set aside or reduce the verdict. The standards governing the determination of excessiveness of jury verdicts and appellate review of trial court decisions on this question are the subject of potentially confusing precedents. Recent Supreme Court decisions have supported a shift toward greater judicial control of this issue.

1. *Standard for Excessiveness*

The customary formulation of the question faced by a federal court in reviewing a jury's verdict for excessiveness has long been whether the amount of the jury's award is "so high as to shock the judicial conscience and constitute a denial of justice." *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978). Such terms as "shock the judicial conscience and constitute a denial of justice" are, of course, vague approximations, which do not provide clear guidance as to how excessive a jury award must be to shock the judicial conscience and constitute a denial of justice. That question is informed, however, by consideration of the Supreme Court's decision in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), on a different but closely related question. The issue in *Gore* was the excessiveness of a *state court* punitive damages award, which had been largely upheld by the highest court of the state. The Supreme Court, recognizing that it had no authority to overturn such a state court judgment unless it violated the Due Process Clause of the Constitution, held that a state court judgment upholding a state jury's punitive damages award should be overturned only if the award is "grossly excessive." *Id.* at 568. A federal trial court reviewing a jury's punitive award for excessiveness, and a federal appellate court (including the Supreme Court), reviewing a federal district court's ruling on that question, have

19

considerably more supervisory authority than the Supreme Court has over the decisions of the highest courts of a state. *See Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 625 (7th Cir. 2000) ("Federal judges may, and should, insist that the award be sensible and justified by a sound theory of deterrence. Random and freakish punitive awards have no place in federal court, and intellectual discipline should be maintained."). A federal appellate court is not required to find that the jury's award was so excessive as to violate due process, as the Supreme Court was compelled to find in *Gore*, in order to justify setting the award aside. *See id.* ("[C]onstitutional limits on punitive damages . . . come into play only after the assessment has been tested against statutory and common-law principles. . . . [W]hen a plaintiff seeks punitive damages in a federal case, it is unnecessary to look for limits in the Constitution."). It therefore follows that a degree of excessiveness less extreme than "grossly excessive" will justify a finding that supports imposing a remittitur.[8] Whether the lower standard introduced by *Gore* abrogated the "shocks the conscience" standard, or simply means that the judicial conscience is now, after *Gore*, more easily shocked, is perhaps an academic question. The *Gore* decision seems to support an increased judicial readiness to curtail any excessiveness.

---

[8] Jones was found liable under both federal law (42 U.S.C. § 1983) and the New York State law of battery, and the jury awarded $300,000 in punitive damages to cover both claims without distinction. N.Y. C.P.L.R. § 5501(c) provides generally that damages awards are excessive or inadequate if they "deviate[] materially from what would be reasonable compensation." While it is not clear from the language of the New York statute that it was intended to apply to punitive, as well as compensatory, damages, it is hard to imagine that the New York legislature expected its courts to exercise this supervisory responsibility only as to compensatory damages, and not as to punitive damages. We recognize that a federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 429-30 (1996). Despite differences in the verbal formulations as between the New York statute and federal case law, we need not make two distinct rulings because, whether examined under the federal standard or New York's standard, we conclude the punitive damages award was excessive under either formulation to the extent it exceeded $100,000.

20

2. *Standard for Appellate Review*

It is conventionally stated that a federal court of appeals reviewing a district court's decision concerning a jury's punitive damages award reviews for abuse of discretion. *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996). The Supreme Court approved that standard in *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279 (1989) ("In reviewing an award of punitive damages . . . [a] court of appeals should . . . review the district court's determination under an abuse-of-discretion standard."). At the same time, however, we explained in *Dagnello v. Long Island Rail Road Co.*, 289 F.2d 797 (2d Cir. 1961), that the discretion of the trial court on excessiveness is subject to substantial constraints. "If the question of excessiveness is close or in balance, we must affirm. . . . We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law." *Id.* at 806. This explanation of the limitations on the trial judge's discretion was cited with approval by both the majority of the Supreme Court and the dissent in *Grunenthal v. Long Island Railroad Co.*, 393 U.S. 156, 159-60 (1968); *id.* at 164-65 (Stewart, *J.*, dissenting).

The Supreme Court's 2001 ruling in *Cooper Industries, Inc. v. Leatherman Tool Group*, 532 U.S. 424 (2001) shed a new light on our question. In that case, the Court considered the standard of review to be applied when a United States court of appeals reviews a federal district court's ruling as to whether an award of punitive damages was so excessive as to violate the defendant's rights under the Due Process Clause of the Constitution. The jury had found the defendant liable on both federal and state law claims and found further that the defendant had

21

"acted with malice, or showed a reckless and outrageous indifference to a highly unreasonable risk of harm" to the plaintiff. *Cooper*, 532 U.S. at 429. The jury awarded punitive damages in the amount of $4.5 million. *Id.* The defendant claimed the punitive award violated due process, invoking the standards of *Gore*. The district court rejected the defendant's claim, and the defendant appealed that ruling. On appeal, the court of appeals concluded that "the district court did not abuse its discretion in declining to reduce the amount of the punitive damages." *Id.* at 431. The Supreme Court granted *certiorari* on the question whether the court of appeals reviewed the district court's ruling under the correct standard. *Id.*

The Supreme Court ruled that the court of appeals erred in reviewing the district court's decision under an abuse of discretion standard, concluding "that the constitutional issue merits *de novo* review." *Id.* The Court reasoned that the determination whether a punitive award is excessive is a question of law, not a finding of fact. On a question of law there is no reason for an appellate court to defer to the trial court's view. Referring to the three guideposts previously identified in *Gore* as pertinent to the determination of excessiveness–degree of reprehensibility of defendant's conduct; relationship between the harm caused and the award; and the sanctions imposed in other cases for comparable misconduct[9]–the *Cooper* Court observed that the respective institutional competencies of trial courts and appellate courts do not support deference to the trial court's conclusions. While the Court conceded the possibility that, as to the first guidepost–degree of reprehensibility–trial courts may in some cases have superior insight into the facts of any individual case, as to the other two guideposts–the relationship between the harm and the award amount and the penalties imposed by law for similar conduct–appellate courts are

---

[9]*See infra* Part II.C for our discussion of the *Gore* guideposts.

no less well situated to conduct the types of broad legal comparisons required to apply these factors.[10] Institutional considerations that call for a deferential standard of review of fact-bound determinations are absent in appellate review of the excessiveness of punitive damages awards. And, because "the legal rules for [excessiveness] acquire content only through application," "[i]ndependent review is . . . necessary if appellate courts are to maintain control of, and to clarify, the legal principles" involved in an excessiveness determination. *Cooper*, 532 U.S. at 436.[11]

---

[10]In its observation that trial courts may be better suited than courts of appeals to assess the reprehensibility of a defendant's conduct by virtue of an intimate knowledge of the facts, the Court may have conceded too much. On a motion to set aside or reduce a jury verdict for excessiveness, trial courts and appellate courts alike are required to view all evidence in the light most favorable to sustaining the jury's verdict, and neither court is free to substitute its own fact findings or credibility determinations for those of the jury. The determination what the evidence showed when viewed in the light most favorable to sustaining the verdict is a question of law, not of fact. There is no reason why the district court's assessment of the evidence in the light most favorable to the party seeking to uphold the verdict should receive deference in an appellate court, as this exercise involves no credibility determinations. Appellate courts are constantly called upon to assess the evidence, viewed in the light most favorable to sustaining the judgment, to determine whether the evidence was legally sufficient to sustain the verdict, *see, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (in reviewing a criminal conviction for sufficiency of the evidence, the relevant inquiry for federal trial courts and courts of appeals is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"), and do not defer in that inquiry to trial courts' assessments.

[11]In support of its reasoning, the *Cooper* Court cited its earlier decisions in *United States v. Bajakajian*, 524 U.S. 321 (1998), in which it held that courts of appeals should review *de novo* the question whether a fine is constitutionally excessive, and *Ornelas v. United States*, 517 U.S. 690 (1996), holding that district court determinations of reasonable suspicion and probable cause are subject to *de novo* review on appeal. *Cooper*, 532 U.S. at 435-46. The Court had ruled in those cases that, while a district court's factual findings underpinning its legal conclusions should be disturbed by a court of appeals only if clearly erroneous, the legal conclusions themselves are subject to *de novo* review.

23

This case differs from *Cooper* in that in *Cooper*, the defendant sought to set aside or reduce the jury's punitive award on constitutional grounds, asserting a violation of due process, whereas in this case, the defendant has argued excessiveness without invoking the Constitution. It is not clear to us why the *Cooper* defendant presented the issue to the district court (which determined how the issue was presented also to the court of appeals and the Supreme Court) as a constitutional question. It appears it was because the Supreme Court had recently, in *Gore*, decided a punitive damages case with a constitutional ruling. But *Gore* was in a very different posture from *Cooper*: In *Gore*, the Supreme Court reviewed a judgment of the highest court of a *state*. The Supreme Court is not the highest authority on issues of state law and has no authority to overturn a state judgment unless the judgment somehow contravenes federal law. Thus, in *Gore*, the state court award of punitive damages was invulnerable to Supreme Court review unless it violated the United States Constitution. *Cooper*, in contrast, was tried in federal court. A federal district court may review a federal jury's punitive award for excessiveness without broaching whether the award violated due process, and courts of appeals and the Supreme Court may similarly review a district court's upholding of such an award on a finding of excessiveness, without needing to rule that the award violated the Constitution.[12] The defendant in *Cooper*

---

[12]The only constitutional question generally arising in such cases was whether the jury's award was immunized from review by the provision of the Seventh Amendment that "no fact tried by a jury[] shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. CONST. amend. VII. The *Cooper* Court explained that, unlike the amount of compensatory damages, the determination of which "presents a question of historical or predictive fact," the amount of punitive damages is "not really a fact tried by the jury." 532 U.S. at 437 (citing *Gasperini*, 518 U.S. at 459). For this reason, appellate review of a district court's determination as to the constitutionality of an award of punitive damages does not implicate the Seventh Amendment in the same way that review of a district court's constitutionality determination of a compensatory award would. *Cooper*, 532 U.S. at 437.

24

therefore had no need to argue that the punitive award was so excessive as to violate due process. It was sufficient to show that it was excessive.

As noted, the Supreme Court ruled in *Cooper* that review is *de novo* when a punitive award is attacked as *constitutionally* excessive. Would the review have also been *de novo* if the *Cooper* defendant had not taken on the unnecessary burden of showing unconstitutional excessiveness, and had asserted mere excessiveness? The Supreme Court stated in dictum in *Cooper* that "[i]f no constitutional issue is raised, the role of the appellate court, at least in the federal system, is merely to review the trial court's determination under an abuse-of-discretion standard." 532 U.S. at 433 (internal quotation marks omitted). We therefore must conclude that our review of the district court's ruling is for abuse of discretion.

Nonetheless we note in passing that it is difficult to understand why the standard of appellate review should change from abuse of discretion to *de novo* merely because a claim of excessiveness is made by reference to due process instead of by reference to federal common law. The reasoning given by the *Cooper* Court for *de novo* review by appellate courts of district court decisions on the constitutionality of punitive awards–that the respective institutional competencies of trial courts and appellate courts do not support deference to the trial court's conclusions, because appellate courts have at least equal and perhaps superior insight into the *Gore* guideposts–is equally applicable to appellate courts reviewing district court decisions on excessiveness under federal common law. If and when the Supreme Court comes to expressly consider the standard of appellate review to be applied to district court decisions on excessiveness under federal common law alone, perhaps it will shed new light on the standard of review.

25

In any event, until then, we must follow the Supreme Court's *Cooper* dictum, and its holding in *Browning-Ferris*, and adhere to an abuse-of-discretion standard in reviewing the district court's decision, and we do. But, as Judge Henry Friendly explored in his article *Indiscretion About Discretion*, the role of appellate courts in reviewing decisions traditionally regarded as under the trial court's discretion varies depending on what type case is being reviewed: "Some cases call for application of the abuse of discretion standard in a 'broad' sense and others in a 'narrow' one," depending on why that particular type of case is "committed to the trial court's discretion in the first instance." Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 764 (1982) (internal quotation marks and citation omitted). *Gore*, in which the Court detailed the ways in which courts of appeals are no less institutionally competent to review punitive awards for excessiveness than are trial courts, counsels that the degree of discretion enjoyed by trial courts in these matters is relatively narrow.

C. *Review of the Punitive Damages Award*

The Supreme Court in *Gore* identified three "guideposts" which in that case indicated that the defendant had not received "adequate notice of the magnitude of the sanction" the state courts might impose for its offense: (1) degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question. 517 U.S. at 574-75.[13] We review the facts in relation to those guideposts.

_____

[13]As noted above, the *Gore* decision was addressed to a different question—the constitutionality of the state court judgment. While a greater degree of excessiveness is required to violate the Constitution than to justify remittitur under the supervisory power of the federal appellate courts over federal trial courts, we have no reason to think the guideposts indicated by the Supreme Court for the constitutional inquiry are not also pertinent for this inquiry. *See, e.g.*, *Lee*, 101 F.3d at 809.

1. *Degree of reprehensibility*

The *Gore* decision described the degree of reprehensibility of the defendant's misconduct as "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Id.* at 575; *see also State Farm*, 538 U.S. at 419. This guidepost is particularly important and useful because punitive damages are intended to punish, and the severity of punishment, as in the case of criminal punishments, should vary with the degree of reprehensibility of the conduct being punished. *See State Farm*, 538 U.S. at 417. *Gore* emphasized "the accepted view that some wrongs are more blameworthy than others." 517 U.S. at 575.

There is no doubt that Jones's conduct was reprehensible. When called in to deal with Payne's assaultive and combative behavior, he gratuitously provoked Payne with a verbal taunt and lost his temper, responding with violence when Payne reacted to the provocation by kicking him. It is also an aggravating factor that Jones recognized that Payne might be mentally ill. It is another aggravating factor that Jones had used excessive force once in the past, and that his conduct is criminalized in New York as a class "A" misdemeanor. *See* N.Y. Penal Law § 120.00.

However, there were also mitigating factors to be counted in Jones's favor in making the degree-of-reprehensibility analysis. Jones's violence was not unprovoked. Payne's violent threats in the hospital had caused the officers to be summoned to control him. Payne struggled to resist the officers' efforts to place him in handcuffs and on a gurney. Jones became violent only after Payne kicked him in the groin. While it is true that Payne's kick in Jones's groin was in response to Jones's inappropriate verbal taunt, it was nonetheless a kick in the groin. While Jones's violence was reprehensible, it was provoked, and that diminishes the degree of

27

reprehensibility.  His attack on Payne, furthermore, lasted at most 30 seconds, did not involve use of a weapon, and did not cause any serious physical injuries.

In short, we have no doubt that Jones's conduct was reprehensible and justified the imposition of punitive damages.  But there were significant mitigating factors, so that the degree of reprehensibility was not all that high.  Payne's provocations and the other mitigating factors mentioned above indicate that Jones's degree of reprehensibility was not particularly elevated, and strongly suggest that the punitive damages of $300,000 are unreasonably high.

2. *Relationship between harm and punitive damages award*

The second "guidepost" that influenced the decision in *Gore* instructs us to look at "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred."  517 U.S. at 581 (internal quotation marks and citation omitted).  Courts often consider the ratio of the punitive damages award to the compensatory award, and consider whether that ratio is reasonable in the circumstances of the case.  While the *Gore* Court noted that the 500-to-1 ratio in the case influenced its decision that the punitive award was unreasonable, the Court also repeatedly stressed the impossibility of making any bright-line test, as the propriety of the ratio can vary enormously with the particular facts of the case.  *See id.* at 582-83; *State Farm*, 538 U.S. at 425.  It is difficult or impossible to make useful generalizations.

When the compensable injury was small but the reprehensibility of the defendant's conduct was great, the ratio of a reasonable punitive award to the small compensatory award will necessarily be very high.  *See, e.g.*, *State Farm*, 538 U.S. at 425 ("[R]atios greater than those we have previously upheld may comport with due process where a particularly egregious act has

28

resulted in only a small amount of economic damages." (internal quotation marks omitted)); *Lee*, 101 F.3d at 811 ("[I]n a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated . . . . [T]he use of a multiplier to assess punitive damages is not the best tool . . . ."). If in such cases significant punitive awards are not available, because of the high ratio in relation to the compensatory award, a plaintiff will often be unable to sue as attorneys would be unable to collect a reasonable fee through a contingency arrangement.[14]

Thus, in cases of very small injury but very reprehensible conduct, the appropriate ratios can be very high. In *Lee*, for instance, the plaintiff was awarded $1 in nominal damages and $200,000 in punitive damages on his malicious prosecution claim under 42 U.S.C. § 1983 against a police officer who attacked him and then falsely accused him of assault. *See Lee*, 101 F.3d at 807-08. On appeal, we reduced the punitive damages to $75,000. *See id.* at 813. Even after the remittitur, the ratio was huge at 75,000 to 1. But 75,000 to 1 was an appropriate ratio on those facts. In such cases, the large size of the ratio has no necessary bearing on the appropriateness of the amount of punitive damages.[15]

On the other hand, when the harm to the plaintiff is substantial, and sufficient to result in a compensatory award large enough to finance a reasonable contingent attorneys' fee, even a

---

[14] Congress sought to alleviate this problem in, *inter alia*, § 1983 cases by providing that courts may award attorney's fees to prevailing parties. *See* 42 U.S.C. § 1988(b); *City of Riverside v. Rivera*, 477 U.S. 561, 576-78 (1986).

[15] Juries will often award nominal compensatory damages together with a reasonable punitive award where the harm to the particular plaintiff is small but the defendant's conduct is egregious. In practical terms, there is virtually no real difference between compensatory awards of one penny, one dollar, ten dollars, or one hundred dollars, coupled with a punitive award of $10,000. But depending on which nominal amount the jury selected, the ratio of the punitive to the compensatory award would vary between 100-to-1 and 1,000,000-to-1, and any of them would be equally reasonable.

29

single digit ratio can mean a high punitive award approaching $1 million. Thus, the Supreme Court observed in *State Farm*, "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit . . . ." 538 U.S. at 425.

Here, the ratio of the $300,000 punitive damages award to Jones's $60,000 compensatory award is 5 to 1. The ratio, without regard to the amounts, tells us little of value in this case to help answer the question whether the punitive award was excessive. Had the facts of the harm to Payne been such that the jury appraised his compensable loss at only $10,000 based on the same conduct by Jones, and the jury had imposed a punitive award on Jones of $100,000, we would not consider the punitive award excessive, even though the ratio of 10-to-1 would have been twice as high as the 5-to-1 ratio that actually resulted. On the other hand, if exactly the same conduct by Jones had caused Payne $300,000 of compensable harm by reason of a concealed susceptibility of which Jones was not aware, and the jury had imposed the same $300,000 in punitive damages, the punitive damages would appear to us to be very high (because of the relevant low degree of reprehensibility of Jones's conduct) although representing only a 1-to-1 ratio. The 5-to-1 ratio of punitive to compensatory damages, by itself, tells nothing about whether the punitive award was excessive, but given the substantial amount of the compensatory award, the punitive award five times greater appears high.

3. *Penalties imposed by law for the conduct giving rise to punitive damages*

*Gore* found "a third indicium of excessiveness" of the punitive award in the fact that the maximum penalty authorized by Alabama's state law for the acts that occasioned the punitive damages award of $2 million was a civil penalty of $2,000. 517 U.S. at 583-84. The Court

30

observed that "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* at 583 (internal quotation marks omitted). Applying that guidepost to this case, it appears that Jones's conduct could support his prosecution in New York for a class "A" misdemeanor of assault in the third degree.[16] *See* N.Y. Penal Law § 120.00. An individual is guilty of assault in the third degree when, "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person." *Id.* Assault in the third degree is punishable by a prison sentence up to a maximum of one year, *see id.* § 70.15(1), and by a fine not to exceed $1,000, *see id.* § 80.05(1). However, the law does not mandate either a prison sentence or a fine.

The fact that New York classes Jones's conduct as warranting criminal prosecution tends to confirm the appropriateness of the imposition of a punitive award. However, it tells little about the appropriateness of the amount of the award. At the same time, the fact that the offense is classed by New York as only a misdemeanor, and that courts are at liberty under New York law to impose no imprisonment or fine whatsoever on a violator (while New York law mandates minimum sentences for numerous offenses), tend to suggest that New York regards this conduct as occupying the lower echelons of criminality.

---

[16] Jones's conduct did not justify prosecution for the class "D" felony of assault in the second degree under N.Y. Penal Law § 120.05. One commits this crime when, "[w]ith intent to cause *serious* physical injury to another person, he causes such injury to such person or to a third person." *Id.* (emphasis added). A "serious physical injury" is one that carries a substantial risk of death, or results in protracted disfigurement, impairment of health, or damage to an organ. *See id.* § 10.00(10). The evidence could not support a finding that Jones caused or intended to cause a serious physical injury to Payne.

As the law allows New York courts complete discretion as to the sentence to be imposed, the punishment that New York courts would impose on one found guilty of this misdemeanor would, of course, depend on a variety of factors, including importantly the degree of reprehensibility of the defendant's conduct. In cases where the degree of reprehensibility was most aggravated, a sentence of one year's imprisonment could be imposed, as well as a fine of up to $1,000. Without doubt a sentence of a year in jail is a substantial punishment.[17] But when the degree of reprehensibility was low, the court might impose neither jail time nor fine. While a New York court might well have imposed some modest jail time on Jones had he been prosecuted and convicted, on our appraisal of the facts, viewed in the light most favorable to Payne, we think it unlikely that a court would have sentenced Jones to any very substantial part of the permissible one year of jail time.

In *Gore*, the fact that Alabama law provided no criminal sanction whatsoever for the subject conduct, and also a very modest civil penalty, gave considerable support to the Court's conclusion that the $2 million punitive award was unreasonable, at least for the reason that the defendant "did not receive adequate notice of the magnitude of the sanction that Alabama might impose." 517 U.S. at 574. The fact that New York does classify Jones's conduct as a class "A"

---

[17] It is difficult to compare the possibility of jail time with a purely monetary punitive damages award, especially when the jail time is within the sentencing court's discretion. For example, courts agree that a year in prison is "a serious sanction." *Lee*, 101 F.3d at 811; *see also Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1222 (11th Cir. 2010) (a "serious criminal sanction"). But they have reached different conclusions about whether that potential year in prison puts a tortfeasor on notice that his misconduct may lead to a substantial punitive award. *Compare Lee*, 101 F.3d at 811 (finding that the third guidepost did not support a $200,000 punitive award in view of a comparable criminal penalty providing for a maximum fine of $2,000 and the possibility of a year in prison) *with Myers*, 592 F.3d at 1222-23 (finding that the third guidepost supported a punitive award of $500,000 in view of a comparable criminal penalty providing for the possibility of a year in prison).

misdemeanor is much less informative. Without doubt it gives Jones the kind of warning that was absent in *Gore*, and strongly supports the imposition of some punitive award, but it tells very little about whether the particular award was excessive.

4. *Comparison with punitive damages awards in similar cases*

Our conclusion drawn from our consideration of the three guideposts that the Supreme Court found helpful in *Gore* is that the first and most important—the degree of reprehensibility of the defendant's conduct—strongly suggests that the punitive award of $300,000 was excessive, while the second and third tell us little that is useful about the size of the award.

Courts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases. *See Mathie v. Fries*, 121 F.3d 808, 817 (2d Cir. 1997) (reviewing a punitive award for excessiveness is a "task [that] requires comparison with awards approved in similar cases"); *Lee*, 101 F.3d at 812 (in deciding whether a punitive award is excessive, "it is appropriate for us to examine punitive damage awards in similar cases"); *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990) (in determinating whether a damages award exceeds the reasonable range, "[r]eference to other awards in similar cases is proper"). The undertaking is precarious because the factual differences between cases can make it difficult to draw useful comparisons. While appellate cases do not capture the entire universe of police misconduct cases in which punitive damages were awarded, they can provide useful reference points as to what amounts this court has found acceptable, and what amounts this court has deemed excessive. In this undertaking, we have identified several cases in which our court has reviewed the question of excessiveness of punitive damages imposed on individual police officers.

33

Our survey shows that we have never approved a punitive award against an individual police officer as large as the $300,000 award here. We have described awards ranging from $125,000 to $175,000 as "substantial," *King v. Macri*, 993 F.2d 294, 299 (2d Cir. 1993), and we have ordered remittitur of awards as low as $75,000, *see id.* (reducing the award to $50,000); *see also DiSorbo v. Hoy*, 343 F.3d 172, 189 (2d Cir. 2003) (reducing a $1.275 million award to $75,000); *Lee*, 101 F.3d at 813 (reducing a $200,000 award to $75,000); *King*, 993 F.2d at 299 (reducing a $175,000 award to $100,000). Moreover, in police misconduct cases in which we sustained awards around $150,000, *see, e.g.*, *Ismail*, 899 F.2d at 187, the wrongs at issue were more egregious than the misconduct of Jones.

In *O'Neill v. Krzeminski*, two police officers attacked the handcuffed plaintiff in the detention area of a police station, with one officer using a blackjack to deliver a blow to the plaintiff's head. *See* 839 F.2d 9, 10 (2d Cir. 1988). The officers then dragged the plaintiff by his throat across the detention area floor before they allowed him to be taken to the hospital, where he was treated for a fractured nose and lacerations to his forehead and eyebrow. *See id.* We affirmed punitive damages awards of $125,000 and $60,000 against the two officers. *See id.* at 13-14.

In *Ismail*, a police officer struck the plaintiff in the back of the head following an argument over a parking citation written by the officer. *See* 899 F.2d at 185. The plaintiff briefly lost consciousness. When he awoke, he found that the officer was pressing a gun against his head and a knee into his back. Although doctors found that the plaintiff had suffered "two displaced vertebrae, a cracked rib and serious head trauma" as a result of the officer's action, the plaintiff spent more than two days in jail and was later tried, and acquitted, on three criminal

34

counts stemming from the parking citation dispute. *Id.* The district court had ruled that the jury's award of $150,000 in punitive damages was excessive. We disagreed, reinstating the award. *See id.* at 189.

Finally, in *King*, state court security officers punched the plaintiff repeatedly and used a choke-hold on him in the course of placing him under arrest. *See* 993 F.2d at 296. The plaintiff was strip-searched and sent to Rikers Island, where he was held for two months awaiting trial on criminal charges that included resisting arrest and disorderly conduct. All the criminal charges were either dropped prior to trial, dismissed by the state court, or resolved by a jury verdict of acquittal. *See id.* at 297. We reduced the jury's punitive awards of $175,000 and $75,000 against two of the officers to $100,000 and $50,000, respectively. *See id.* at 299.

The case most helpful to our analysis is *DiSorbo*, which strongly supports the view that the $300,000 punitive award in this case was excessive. It involved far more egregious misconduct on the part of the defendant police officer, and we reduced the jury's award of punitive damages well below the $300,000 here at issue. The plaintiff was a woman who was arrested by the defendant police officer without just cause in retaliation for having spurned his advances at a bar. *See DiSorbo*, 343 F.3d at 176. At the police station, the defendant slammed the plaintiff into the entry door and then pushed her against a wall, grabbing her throat and choking her. *See id.* at 177. When she tried to defend herself by kicking the defendant, he responded by throwing her to the ground and striking her repeatedly. *See id.* The attack left bruises on the plaintiff's head, shoulder, and hands, but did not cause any permanent scarring or nerve damage. *See id.* at 179. The jury awarded punitive damages of $1.275 million. We reduced the award to $75,000. *See id.* at 189. It would be impossible to reconcile the $300,000

35

punitive award against Jones for his less reprehensible conduct with the reduction of the *DiSorbo* award to $75,000.

5. *Totality of the factors*

In considering the complex totality of factors that affect a decision on this question, we conclude that the district court's rejection of Jones's motion to reduce the amount of punitive damages must be overturned. We believe the award was impermissibly excessive. Our ruling should not be construed as making light of Jones's misconduct. Without question Jones engaged in serious misconduct which justifies a punitive award. On the other hand, his misconduct in light of all the circumstances was not so egregious as to justify punitive damages of $300,000. We conclude upon all the relevant factors discussed above that the highest level of punitive damages that can properly be sustained is $100,000.

## CONCLUSION

The judgment awarding punitive damages is hereby vacated, and a new trial is ordered limited to the issue of the amount of punitive damages unless Payne agrees to a remittitur reducing the amount of punitive damages to $100,000. In all other respects, the judgment is affirmed.